## MRS. E. KEMPNER v. MRS. L. DILLARD.

### No. 1659.   Decided April 17, 1907.

**1.—Agent—Undisclosed Principal.**

Where the agent buys property in his own name, the principal, whose money purchased it, being undisclosed, it immediately becomes the property of the principal, not of the agent; the intention of the agent to defraud the principal in the transaction does not change the effect. (Pp. 509, 510.)

**2.—Same—Innocent Purchaser.**

R. purchased cattle for K., an undisclosed principal, with whose money he paid for them, handling them, with other cattle of K.'s and his own; he put his own brand on the calves. Held, that the legal title to the cattle and their increase was in K., the principal, and prevailed over the lien of a mortgage given by R., upon all the cattle in his own brand, to L. who had no knowledge of K.'s ownership. (Pp. 507–510.)

Questions certified from the Court of Civil Appeals for the First District, in an appeal from Fort Bend County.

*Hutcheson, Campbell & Hutcheson,* for appellant.—On the facts certified, immediately upon the acquisition of the cattle by the payment of money, the property was then vested in Mrs. Kempner in full and complete ownership, the facts disclosing that every dollar of the purchase money was furnished by her, and that the cattle were purchased in pursuance of her instructions, by her agents, so that neither do the facts justify an inference of fraudulent intention in the purchase, nor, if they do, does that intention in anywise affect the destination of the property in the cattle, or raise a trust therein, the product or substitute for her money following the nature of the money itself, and becoming the property of Mrs. Kempner in the same quality as she held the money which purchased them, the contract being her contract, and the cattle purchased hers; nor does she need to invoke any equitable doctrine for her protection, having the full and complete legal property in the cattle, upon which she is entitled to prevail in a court of law, or in any legal form of action, against any and all adverse claims. Lowery & Bruce v. Beckner, 5 B. Mon., 43; Waldo v. Peck, 7 Vt., 435; Tainter v. Lombard, 53 Maine, 369, 87 Am. Dec., 552; Cushing v. Rice, 71 Am. Dec., 579; Gilpin v. Howell, 5 Pa. State, 50; Odessa Bank v. Jennings, 18 Mo. App., 651; 2 Clark and Skyles on Agency, secs. 528, 543, 550; Conard v. Atlantic Ins. Co., 1 Peters, 387; Taylor v. Plumer, 3 Maule & Selwyn, 562.

The plea of innocent purchase, if available at all to Mrs. Dillard, would only be available to her upon her proof that Riddick held the real or apparent indicia of ownership, and that, after reasonable and prudent investigation, no facts were brought to her notice which would put her upon inquiry as to the true state of the title, and this is especially so as relates to personal property. Such being the case, under the evidence herein Mrs. Dillard wholly fails to bring herself within the protection of the rule. New York & Texas Land Co. v. Hyland, 28 S. W. Rep., 209; Hill v. Moore, 85 Texas, 346, 347; Wells v. Littlefield, 59 Texas, 556; Brown v. Vaughan, 70 Texas, 50; 2 Pomeroy on Eq. Jur., secs. 735, 778, 608, 606, 612, 600, 607, 811, 738, 739; Thompson v. Barnum, 49 Iowa, 392.

*D. R. Peareson,* for appellee.—A party who, in good faith, lends money on the security of property, the legal title to which is in the borrower, without notice of the rights of the equitable owner of said property, is entitled to be protected against the equitable owner. This applies to personal as well as real property. Anderson v. Waco State Bank, 49 S. W. Rep., 1030; Hill v. Moore, 62 Texas, 613, and authorities there

cited; New York v. Hyland, 28 S. W. Rep., 210; 2 Posey Unreported Cases, 214; 1 Perry on Trust, sec. 130, p. 146.

Actual knowledge is not necessary to create an estoppel where the circumstances are such that a knowledge of the facts will be imputed to the party to be estopped. The circumstances surrounding the acquisition, branding, possession, control, and mortgaging of the "30" cattle by Riddick are such that Mrs. Kempner was put on notice thereof, and of the claim of ownership and mortgaging thereof by Riddick. 2 Pomeroy Eq., sec. 805; Westbrook v. Guderian, 22 S. W. Rep., 60.

Intention to deceive is not required in order to constitute an estoppel when the other elements exist. It is sufficient if the silence or failure to act is reasonably calculated to induce the other party, while acting in good faith and exercising ordinary diligence, to act thereon. Westbrook v. Guderian, 22 S. W. Rep., 60; 7 Am. & Eng. Ency. (1st ed.), 16; Herman on Est., sec. 953; Bigelow on Est., 547; Kempner v. Huddleston, 37 S. W. Rep., 1067.

GAINES, CHIEF JUSTICE.—This case comes to us upon the following certificate from the Court of Civil Appeals for the First Supreme Judicial District:

"Mrs. Lillian Dillard brought this suit against the independent executrix of C. W. Riddick, to recover balance due on a note given by him, and against Mrs. E. Kempner, for the value of certain cattle alleged to have been converted by Mrs. Kempner, and upon which Mrs. Dillard is alleged to have had a lien to secure the payment of the balance due on the note sued on. Answering to the merits, Mrs. Kempner pleaded the general denial and claimed the cattle as her own. Mrs. Dillard pleaded that she held her lien on the cattle as an innocent purchaser for value, without notice of Mrs. Kempner's title. A trial by the court, without a jury, resulted in a judgment in favor of plaintiff against Mrs. Kempner for a sum equal to her judgment upon the note, and Mrs. Kempner has appealed.

"The history of the case, as disclosed by the record, is as follows: C. W. Riddick owned a plantation near Richmond, in Fort Bend County, Texas, on which he resided. On March 30, 1903, Riddick, for a valuable consideration, executed and delivered to the First National Bank of Houston, Texas, his promissory note for $3,000, bearing eight percent interest, and due December 1, 1903. To secure the payment of this note he executed and delivered to the bank a mortgage, in writing, covering certain cattle by the following description: 'All those certain cattle, being between seven and eight hundred in number, now owned by me, branded C. R., and now running on the range in Harris and Fort Bend Counties, in Texas, and being all of the cattle owned by me in said brand, including in this conveyance all other cattle that I may own or become the owner of in said brand, or that may hereafter be put in said brand, and including also all of the increase of cattle herein conveyed.' This description was followed by a warranty.

"In January, 1904, prior to the death of Riddick, J. R. Farmer, acting as the agent of Mrs. Dillard, agreed to take up and carry the Riddick note of $3,000, and advance to him a further sum sufficient to make the loan $5,000. These sums were to be loaned upon the security of the

cattle then claimed to be owned by him. Before making the loan or taking up the $3,000 note, Farmer proceeded to make inquiry as to the status and value of the security offered. Riddick referred him to his (Riddick's) agent, one Blakely, who made to Farmer a statement showing the ownership by Riddick of all the cattle in the C. R. brand then on the range, as well as the ownership of other cattle not in that brand. The cattle were in Riddick's actual possession and control, and Farmer learned, upon examination of the record, that the C. R. brand had been duly registered as Riddick's brand in January, 1903, and that the mortgage to the bank had been duly recorded. Farmer thereupon concluded that the security offered was ample, so without notice, actual or otherwise, that any other than Riddick owned or claimed the cattle, or any interest therein, he purchased the note for Mrs. Dillard, and would have advanced the remaining sum to Riddick, as agreed, but for Riddick's death. Mrs. Dillard was equally without knowledge of adverse interests or claims. At the date of the mortgage Riddick owned in his own right a lot of cattle which he purchased from one Fields, and which are referred to in the record as the Fields, or 'mule-shoe' brand cattle. These and their increase were put in the C. R. brand.

"In 1902, and prior thereto, Mrs. E. Kempner, survivor of the community of H. Kempner and wife, had some business dealings with Riddick, and had advanced him money. Having had to take a good many cattle for debts due the Kempner estate, Mrs. Kempner decided to concentrate her cattle interests at Richmond and place them in charge of Riddick, and this she proceeded to do through her agents and representatives. The arrangement with him was that he should take charge of her cattle and bear the cost of looking after them, and the net profit should be divided between her and Riddick. Pursuant to this arrangement, several bunches of cattle were placed in Riddick's hands and branded in Kempner's brand, which was K. Mrs. Kempner's agent in the management of these affairs was her son, D. W. Kempner, and Mrs. Kempner personally had no knowledge of them.

"In 1902 a man named Forest Clark had charge of some cattle at Alice, Texas, belonging to a Mrs. Collins. The range was dry, and, wishing to sell them, he communicated with one Andrus. Thereupon Kempner authorized Andrus to go to Alice and inspect the cattle, and if they were a good value, to buy them. The evidence is conflicting upon this point, but is sufficient to sustain the following findings in support of the judgment. Andrus advised Clark that a man at Richmond wanted some cattle, and Clark went to Richmond to make the sale. Andrus introduced him to Riddick, and, after some discussion, Riddick and Andrus went to Alice to inspect the cattle. Riddick gave Clark a check on the Kempners for $600 in advance as earnest money. He bought the cattle in his own name, and Clark sold them to him, knowing no other party in the transaction. Andrus remained at Alice to receive the cattle, which he did, and consigned them by rail to Riddick at Clodine, near Richmond. They were finally paid for by drafts drawn by Andrus on the bank at Alice, the funds having been placed there for the purpose by Kempner. There is no question but that Andrus was the agent entrusted by Kempner to purchase the cattle and draw the drafts

for the payment. It is equally clear that Riddick was also sent to Alice to inspect the cattle for Kempner, and to act with Andrus in the purchase. They were intended by Kempner to be turned over to Riddick, and kept by him on the range near Richmond on the same terms as the other Kempner cattle. Clark testifies in the most unequivocal way that Riddick bought in his own name, and that he, Clark, sold and conveyed them to Riddick, and knew no other vendee in the sale. There was no written bill of sale, either to Riddick or Kempner. The transaction was verbal. Clark knew Kempner only as the drawee of the checks. There is much in the record that points to a different conclusion, but Clark's testimony is unequivocal, and is by no means without other facts which tend to support it.

"These Clark cattle were in the '30' brand when bought. They consisted of 600 cows and about 30 bulls. Riddick placed them on the open range with his and Kempner's cattle, openly claimed and treated them as his and had the 1902 and 1903 calves of these cows branded in his own brand, C. R. At least 125 of these calves, the increase of the cows in the '30' brand, were so branded at the date of the mortgage to the bank and the calves of 1903 were branded in the same way.

"Notwithstanding all this it remains undisputed that Kempner trusted Andrus to purchase the cattle and Riddick to handle them for the Kempners as the Kempner cattle on the same terms as set out above, and that Kempner's money paid for them and that the beneficial title to the cattle was in Kempner.

"In May, 1904, Mrs. Kempner made a range sale of all her cattle and the Riddick cattle to one H. S. Dew. For the Fields cattle which were branded C. R. she paid Mrs. Dillard $1,550, conceding that the Fields cattle and their increase belonged to Riddick and were covered by the lien. This controversy has arisen over the increase of the '30' brand cattle which were branded C. R. and the plaintiff accepted the $1,550 last above mentioned without prejudice to her right to press her claim against the cattle involved in this suit.

"At a former day of this term we affirmed the judgment of the court below on the theory that, because Riddick, the agent of Kempner, had taken the legal title to the cattle in his own name, though in fraud of his principal, Mrs. Dillard who acquired her lien upon the cattle for value without notice of Mrs. Kempner's interest was protected in her purchase as against the claim of Mrs. Kempner.

"As there is much doubt and some difference of opinion among the members of this court as to the correctness of this conclusion, we under our general right to certify respectfully propound for your answer the following questions:

"1st. Did we err in holding that Riddick, by actually buying the cattle in his own name and in fraud of his principal, Mrs. Kempner, thereby acquire the legal title thereto, notwithstanding his agency and the fact that they were paid for with the funds of his principal?

"2d. If the first question is answered in the negative, then were the rights of Mrs. Dillard (acquired as they were innocently and for value) superior to those of Mrs. Kempner?"

We are unable to see anything in this case to take it out of the ordinary rule, that the contract of an agent, who deals in his own name without disclosing that of his principal, is the contract of the principal. The party contracted with may sue the principal for the enforcement of the contract, when he learns that the agent was acting for another; and so the principal may sue the third party to enforce his rights under the contract, subject to any equities of such party as against the agent. Where the agent buys property in his own name, his principal being undisclosed, it immediately becomes the property of the principal, and not that of the agent. The doctrine applies even to written contracts, except to negotiable instruments and such contracts as are under seal. These propositions are elementary, and are founded upon the principle of the identity of the principal and agent. Therefore when Riddick purchased the cattle, as agent for Mrs. Kempner, paying for them with her own money, she became invested with the legal title thereto, unless his intention to defraud her by suppressing the knowledge that he had a principal can change the rule. The doctrine uniformly announced is that the undisclosed principal may sue upon the contract made by the agent in his behalf. This could not be at common law, unless the principal had the legal title.

Can it make a difference that in not disclosing his principal Riddick intended to defraud her? We are of the opinion that the intention of the agent does not affect the rule. To hold otherwise would be to confer a right upon a fraudulent agent, which one who acted fairly would not have, and to permit a party to take an advantage from his own wrong. In this connection the remarks of the court in Waldo v. Peck (7 Vt., 435), are pertinent: "Where the notes were made payable in specific articles, or where such articles were received in payment of any notes thus taken, the articles received immediately became the property of the principal, and not of the agent. It is of no consequence what were the intentions of the agent as to purchasing the horse. Unless plaintiff assented, it could not affect him in any wise."

We answer the first question in the affirmative; and hence are not called upon to answer the second.