## HOLMES v. TYNER. (No. 837.)

(Court of Civil Appeals of Texas. Amarillo. Oct. 30, 1915.)

1. PRINCIPAL AND AGENT ⬤⇒23—AUTOMOBILE —SALE — REPUDIATED AGENT — SUFFICIENCY OF EVIDENCE.

In an action by an automobile dealer for the value of a car purchased by defendant from one representing himself as agent for plaintiff, evidence *held* to support a finding of agency.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. § 41; Dec. Dig. ⬤⇒23.]

2. PRINCIPAL AND AGENT ⬤⇒14 — IMPLIED AGENCY.

The relation of principal and agent does not arise from an express appointment merely, but also by implication from the words and conduct of the parties and the circumstances of the particular transaction.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 26–33; Dec. Dig. ⬤⇒14.]

3. HUSBAND AND WIFE ⬤⇒23¾—AGENCY OF WIFE—SCOPE OF AUTHORITY.

In an action by an automobile dealer for the value of a car purchased by defendant from one representing himself as agent for plaintiff, evidence *held* to warrant a finding that plaintiff's wife was his agent with authority to employ salesmen.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. §§ 145, 146; Dec. Dig. ⬤⇒ 23¾.]

4. PRINCIPAL AND AGENT ⬤⇒100 — GENERAL MANAGER—SCOPE OF AUTHORITY—HOW DETERMINED.

A general agent for the management of a business has authority, coextensive in scope with the business intrusted to him, to do what is customary in such business; consideration being given to the character of the business and the usual manner in which it is conducted.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 262–273, 345, 364, 368–373; Dec. Dig. ⬤⇒100.]

5. PRINCIPAL AND AGENT ⬤⇒103 — BUSINESS NECESSITY — AUTOMOBILE DEMONSTRATOR — IMPLIED AUTHORITY.

Where it appeared that to succeed as a going concern the nature of plaintiff's business required that salesmen travel about the country to demonstrate and sell cars, and the facts show an implied intention on plaintiff's part to authorize another to act as such agent, a sale by the latter was binding on plaintiff, since such agent had implied authority to sell.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 278–293, 353–359, 367; Dec. Dig. ⬤⇒103.]

6. PRINCIPAL AND AGENT ⬤⇒103 — AGENCY — SALESMAN—AUTHORITY TO EMPLOY.

Where plaintiff's wife was left in general charge of his automobile agency and she employed one to act as a demonstrator and salesman, such being customary in the business, or necessary to carry it on, a sale by the employé was binding on plaintiff, since, under such circumstances, the wife had implied authority to so employ.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 278–293, 353–359, 367; Dec. Dig. ⬤⇒103.]

**7. Principal and Agent ⬦➡145—Express or Implied Authority — Third Person — Knowledge of Authority—Immateriality.**

Where the act by which it is sought to bind the principal was within the authority actually conferred by the principal either expressly or by implication, one contracting with the agent need not show that he had knowledge of such authority and acted on the faith of it, since under either form of authority the act of the agent is that of the principal.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 499, 513–520; Dec. Dig. ⬦➡145.]

**8. Principal and Agent ⬦➡137—Unauthorized Act of Agent—Estoppel—How Created.**

Liability on the principal's part for the unauthorized acts of his agent rests upon estoppel arising from words or conduct of the principal indicating the existence of authority in the agent to do the thing in question upon which there is a reliance in good faith.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 492–494; Dec. Dig. ⬦➡137.]

**9. Principal and Agent ⬦➡103 — Sales — Agency—Barter Excluded.**

In general, the power of the agent to sell does not include the power to barter.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 278–293, 353–359, 367; Dec. Dig. ⬦➡103.]

**10. Principal and Agent ⬦➡100 — Apparent Authority—Determinable—Effect.**

In determining the question of apparent authority, the character of the service, together with the usual practice of agents in such employment, may be looked to, and the agent is held to have implied authority to do all those acts which are naturally and ordinarily done and reasonably necessary in such cases.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 262–273, 345, 364, 368–373; Dec. Dig. ⬦➡100.]

**11. Customs and Usages ⬦➡4 — Scope of Agent's Authority—Duration of Custom.**

A custom or usage to enlarge an agent's express authority must be shown by clear and satisfactory evidence, and must have existed long enough to make it widely and generally known, and such as will warrant the presumption that the principal had it in view at the time of appointing the agent.

[Ed. Note.—For other cases, see Customs and Usages, Cent. Dig. § 3; Dec. Dig. ⬦➡4.]

**12. Principal and Agent ⬦➡123—Automobile Demonstrator — Power to Barter — Evidence—Sufficiency.**

In an action by an automobile dealer to recover the value of a car alleged to have been bartered by his sales agent in excess of authority, evidence *held* insufficient to establish authority in the agent to barter under his express authority or that implied by custom.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 420–429; Dec. Dig. ⬦➡123.]

**13. Principal and Agent ⬦➡152 — Unauthorized Act—Automobile—Barter—Effect.**

Where defendant procured an automobile by barter from one holding himself out as a sales agent for plaintiff, an automobile dealer, but who had no authority to barter, defendant was liable as for a conversion, since, in the absence of authority in the agent to barter implied by custom or otherwise, defendant was bound at his peril to ascertain the agent's true authority.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 567–569; Dec. Dig. ⬦➡152.]

**14. Principal and Agent ⬦➡40 — Demonstrator—Authority to Sell—Revocation —Sufficiency of Evidence.**

In an action by an automobile dealer to recover the value of a car procured by defendant through barter with plaintiff's sales agent, evidence *held* insufficient to show a revocation of the agent's authority prior to such sale.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. § 63; Dec. Dig. ⬦➡40.]

Appeal from District Court, Childress County; J. A. Nabors, Judge.

Action by M. A. Holmes against W. C. Tyner. From a judgment for defendant, plaintiff appeals. Reversed.

Fires & Diggs, of Childress, for appellant. Jos. H. Aynesworth, of Childress, for appellee.

HUFF, C. J. [1] The appellant, Holmes, instituted this suit for the conversion of an automobile of the alleged value of $2,050, by appellee, Tyner, alleging the title in himself. The appellee, Tyner, answered, admitting the possession and alleged he purchased same through appellant's agent; that one Hawkins was the agent of appellant and brought the machine to Childress and exposed it to sale and claimed to be the agent of appellant, who it is alleged held Hawkins out as such and that appellee was informed by Hawkins and others that he was the agent of appellant; that Hawkins offered to sell the car and distributed literature of appellant and had possession of the car for the purpose of selling and demonstrating the car to prospective purchasers, and did show to appellant and others the car and held himself out as agent of appellant with power to sell, and solicited the sales of other cars of the same make and manufacture; that, after full notice of the acts of Hawkins, appellant paid divers and sundry costs and expense bills for him, and ratified and confirmed the acts of Hawkins, and directed Hawkins to proceed with the sale and to advertise and demonstrate the merits of the car and to seek and sell prospective purchasers for the car, and that thereby appellant was estopped to deny the right and authority of Hawkins to make the sale; that all of said acts of Hawkins were within the apparent scope of his authority, "and was within the ordinary and customary authority of one so using, demonstrating, and offering for sale cars when they are permitted to handle, demonstrate, and use cars, and that plaintiff well knew such to be the usual, ordinary, and customary object of one out so demonstrating, and, if the plaintiff did not in fact give and authorize the said Hawkins full power to make the sale in question that

said plaintiff was negligent in permitting the said Hawkins to make such use of the car and is now estopped to say that Hawkins had no such authority"; that appellant, relying upon the acts and conduct of Hawkins, and the permission of Hawkins by appellant to so act, which was known to appellant, or by the exercise of ordinary care could have been known to him, induced appellee to purchase the car and pay full value to Hawkins, to wit, $950 cash and one E. M. F. car, as the consideration therefor, and thereby appellant was estopped to deny the agency.

Appellant, by supplemental petition, denied specifically all the allegations in the answer, and denied that appellee got possession of the car from an agent of appellant, or that he purchased the same from such agent, but that in acquiring possession thereof he did so by barter and trade with Hawkins and never paid the value of the car in cash to any person. It is admitted therein that Hawkins was in possession of the car, but was so unlawfully, etc. The fact of Hawkins' possession and the manner by which he obtained and held it was specifically alleged, showing a wrongful possession. The facts hereinafter set out will indicate the specific facts relied on as showing an unlawful possession as relied on and set out in the supplemental petition.

A verdict was rendered for the appellee, upon which judgment was entered. The appellant requested the court to instruct a verdict for him, and also, in his motion for new trial, requested that the verdict of the jury be set aside for the reason that there was no evidence supporting the verdict, because: (a) It is admitted in the pleadings that appellant was the owner of the car, and the evidence did not warrant the jury to find Hawkins was his agent to sell and use the car in Childress county; (b) if he was the agent to sell, he was not authorized to accept in part payment trade as alleged by appellee; (c) if prior to the sale he was the agent, such agency was revoked before the trade to appellee, and the agency was not at any time known to appellee; (d) that appellee by his own evidence shows that he dealt with Hawkins as the owner and not as an agent.

In stating our conclusions of the facts we shall state them from appellee's standpoint. Appellant, Holmes, at the time of the transaction, had the state agency for the Jackson cars, situated in Ft. Worth. The car in question was one of that make. The cars, when delivered to appellant, were paid for by him and he employed agents thereafter to resell them. About the 20th day of April, 1913, appellant turned the car over to J. A. Hawkins, as he testifies, to go up the Denver road as far as Alvord or Decator, and to bring to Ft. Worth some prospective purchasers, which Hawkins claimed to have, and to show them the Jackson cars at Ft. Worth. The facts in this case show that Hawkins at some time thereafter went to Childress with the car in issue, and showed and tried to sell it, and represented that he had authority to do so. Mr. Knight, who it appears was the local agent for the Jackson car at Childress, by virtue of a contract entered into with appellant at some time before the sale, went with Hawkins to visit the appellee. On this trip Hawkins showed the car to appellee and the manner of its working and at this time gave appellee some literature with reference to the Jackson make of cars. T. F. Abbott, who during this transaction was employed as an agent for appellant in the sale of these cars, testified that at that time he resided in Ft. Worth and in the absence of both appellant and his wife managed the office at Ft. Worth. This witness says, about five days before Hawkins left with the car on April 20th, he (witness) returned from a trip and found Hawkins in the office and was introduced to him by Mrs. Holmes. This witness states that when he left to go to Clarendon (from the trip thereto, from which he had just returned when he first met Hawkins) appellant was not at the office and was out somewhere, and when he returned appellant was still out of the office, but during the time had been back and had gone away. At the time the witness got back Mrs. Holmes was in charge of the office. The witness testified Mrs. Holmes introduced him to Hawkins and he thinks Mrs. Holmes then said, "or something to the effect she had a salesman there. I do not remember her exact words, but that is nearly as I can remember them. We did not talk but little." Hawkins appears to be the person there referred to. At the direction of Mrs. Holmes, Hawkins took the witness home from the office in a car. After this first conversation with Mrs. Holmes with reference to Hawkins, witness asked Mrs. Holmes if she knew anything about him.

"She said she had 'phoned to the manager of the Carter car, Mr. Mathews, and that he said he was a good man but would steal anything he got his hands on. Mathews claimed the fellow had sold one of the tires off of a car and had put on an old one in its place, and I said, 'No business man in town would keep a man on that recommendation,' and I think she replied she would keep him and try him, or that was the meaning of it."

The witness also testified the only car other than the one in issue, that he knew of Hawkins taking out, was one on the evening he (witness) returned. He took out a gray Roadster and took some one in it to show it. The witness testified that Holmes himself turned the car over to Hawkins, who left with it for some point up the Denver, and witness' understanding was that he was to work some territory up there. He testified that he thinks Hawkins first stopped at Alvord, and that he knew he stopped at Wichita Falls from the fact that the office got hotel bills from there. The bill was not paid by Mrs. Holmes then nor after,

that he knew of. The next he heard of Hawkins was at Childress. He heard this either through Mr. or Mrs. Holmes. There was then something said about recalling him from Childress, and he thinks it was Mr. Holmes that mentioned that. At this point he testified:

"I came into the office about the time Mr. Holmes finished a telephone conversation with some one up here (Childress), and he told me he had told whoever he had talked to up here to take the car and put it in the garage, and that this man at this end of the line said there was a chance to sell it, and he told this man here to put it in the garage, or if it was sold to have the check or draft made out to M. A. Holmes."

A day or two before Holmes 'phoned, he said:

"He thought he would go after the car, or that he had gotten a letter from Hawkins, or perhaps a telegram, saying he would be in with the car in a day or two, with some prospects. Holmes said he would be in with the car and two or three men he thought he would sell cars to. Hawkins was in Childress at that time, I believe."

This witness testified the duties of a demonstrator was to go out and get hold of a man who looked like he wanted an automobile and to either bring him in or sell him, or both. He also stated:

"It was customary, while I was working for Mr. Holmes, for him or me, and for other parties working for him, to go out and bring in prospects and sell them at the office. If we could not sell them the model we had out and thought we could land them, we would bring them to the office. If they liked the model we had out, we would sell it to them."

He further stated he (witness) had no authority to sell except for cash, unless he got permission from the office.

"I frequently took in old cars when the trade was satisfactory to Mr. Holmes. Whenever he said it was all right, I took in old cars on new ones. So far as my knowledge of the automobile business goes, it is the usual and customary way of placing cars, where the customer requires it and the conditions necessary to make a trade, take an old car and make a reasonable value on it where you can get the old car at a price you can turn it quickly for cash and enough cash for the new car."

The appellee testified that he had seen the car for some time previous to its purchase, in and around Childress. The week previous to the time he traded for the car Hawkins came to his place with the car in company with Mr. Knight, the local agent for the Jackson car at Childress, and two other parties, and showed him the car. In the next week after the above visit Hawkins brought the car down to his place and they traded. He paid $950 cash for the car; that is, he paid $900 cash to Hawkins and reserved back $50 which was deposited in the bank until he should receive some repairs from the agency at Ft. Worth and put in on the trade his old E. M. F. car. This and the money was the consideration for the auto in question. In answer to what Hawkins represented as to his being the agent and demonstrator for the car, he answered: "He said he— he talked like he was one of the main men

to me." He testified he had never seen Holmes prior to the trade or had any conversation with him or did any business with him. On the Monday following his purchase, the week before, he had a talk with Holmes in Childress at that time. Holmes said Hawkins was a demonstrator. When he bought the car he did not know Holmes was the owner. Hawkins told him he was the demonstrator of the car.

"I bought the car thinking he (Hawkins) was the agent for the car. You ask me if I did not think he owned it? I do not know what you might call it. I thought I was buying from the right man. Q. The man who owned it? A. Yes, sir; I thought he was a member of the outfit, and that is the reason I bought it. You ask me if it is not a fact I did not buy it relying on his representation that he was the agent? I will say that he made me think he was part of the firm. I thought then for that reason that I was buying it from the owner, and acting on that I did buy it. Up to that time Holmes had never done any act that had led me to believe this man Hawkins was the agent. He had never had any transaction with me to cause me to believe that, and he never made any statement to me to cause me to believe that. I never knew him at all before that time and did not know him until after I bought the car."

In one portion of his testimony, on direct examination, he said that he bought the car because he thought Hawkins was the agent of Holmes, which was one of the reasons for the purchase. On redirect examination he testified:

Hawkins said "he was a part owner of the firm down there. I relied on his statement, and what I saw and observed, and thought he had authority to sell the car."

Mrs. Caroline Holmes, the wife of the appellant, testified that her occupation was that of a housekeeper and assisting her husband in his business of selling automobiles; that the car in question, as she understood, was her husband's, and if it had ever been sold she did not know it; that she knew J. A. Hawkins and had had some business transactions with him in reference to the car in question; that after he had taken the car she learned that he was in Childress, Tex., by a draft drawn on them indorsed by Knight for $25. She says she paid the draft on the indorsement of Knight and told Mr. Knight not to indorse any more drafts for Hawkins; that she never authorized Hawkins to sell or dispose of in any manner the automobile in question to anybody, and did not authorize its sale to the appellee, and that when she learned that Hawkins was in Childress with the car she 'phoned him some two or three times relative to the car and tried to get him to return it, and at last told him to place the car in some garage subject to the order of John Knight, the local distributor. Her husband was not at home, and she did not know what else to do. She testified that there was no expense bill paid for Hawkins prior to his going to Childress, but that she did pay one such expense bill by draft for $25. She testified that if Hawkins was the agent for Holmes in Child-

ress she did not know it, but she did know that Knight was the local distributor there, and she knew of no authority given Hawkins to demonstrate in Childress county.

"I heard Mr. Holmes tell Mr. Knight he could sell the car to some person living in Childress, and if Knight did not make that sale for him to put the car in the garage; that he did not want Hawkins running it or making any more bills, and if Knight did sell the car to get the draft and send it to Mr. Holmes. Mr. Holmes' instructions were that, if Mr. Knight did not sell the car, for him (Knight) to leave it in the garage and Mr. Holmes would go for it. I tried to get Mr. Hawkins immediately after I got the draft to bring the car back"

—and that she did not know that Hawkins was trying to make a sale in Childress or any other place.

The appellant himself testified that he gave no authority to Hawkins to sell the car to Tyner or any one else; that the last time he saw the car before he saw it in Tyner's possession was the 20th or 25th of April. When Hawkins left with the car, he had known him about two weeks. He testified: That he or his wife did not employ Hawkins. "My wife usually managed the business while I was gone, and I was gone some of the time. No, she did not manage it during the month of April, 1913." That he let Hawkins take the car, and his wife knew nothing about it. The witness stated he let Hawkins have the car to go up the Denver road to Decatur and Alvord to bring some prospective purchasers in the car to Ft. Worth. He states that Mr. Abbott says when Hawkins took the car it was the 20th, but that he was under the impression that it was a week later, but he might be mistaken as to the date. He states that he heard of Hawkins at Childress on the 8th or 9th of May, and that he learned this upon his return from Michigan to Ft. Worth. That he had gone to see his mother, who was sick in Michigan, and that his wife had charge of the office during the time he was absent from the city. "My wife was in charge of the office while I was gone. She was my duly authorized agent during my absence. I have discussed this matter with her. I have not seen letters of messages to her from Hawkins. She simply looked after the business while I was away." He says that he never employed Hawkins for any purpose except to unload the cars, but that he let him have the car to go up after prospective purchasers, and that he did not take the car without his consent. After his return from Michigan he stated:

"I had a conversation over the 'phone with John Knight of Childress, and he told me he had the prospect for selling one car. He did not say he had a prospect for selling more than one. I did not tell him at that time to go ahead and sell this particular car that Hawkins had up here. I told him I had given Hawkins instructions on Saturday night to put the car in the garage and leave it there, and he (Knight) said he thought I was making a mistake, and I said 'If you can sell this car, all right, and, if you do, get a draft made out to me and send it to me, but I don't want Hawkins to have anything more to do with the car.'"

He says he left for Michigan on the 23d or 24th of April, and returned home about the 8th of May, and learned at that time from his wife that Hawkins was in Childress. That he called Hawkins over the 'phone, but did not get him when he first called, but did get him the next day. That he called through Mr. Knight, who was selling the Jackson car at that place. Knight told him that Hawkins was there, but he did not tell the witness that he was trying to sell the car. He did not talk to him much. That he told Knight not to let Hawkins have anything more to do with the car and told him he did not want Hawkins to have the car. Hawkins said, "All right." Hawkins and Knight were there together at the time, and he then had a conversation with Hawkins, who said he would put the car in the garage, and he told Hawkins that he and his wife would come up Saturday night and drive the car back Sunday. That he did not know when the car was sold after that time. The following Sunday he went to Childress. In the meantime he received a letter from a Mr. Hughes at Quanah, stating that Hawkins had sold the car. On receipt of the letter, he 'phoned Knight, who said the car was in the garage. "I told him there must be a mistake about it and about receiving the letter." Knight asked him to hold the 'phone until he could go and see about it, and he came back and said it was gone. He says the conversation he had with Knight in regard to a good prospect for selling the car was not after it had been sold; that that conversation was just a week previous to the last conversation over the 'phone about the car being gone. "At that time he told me he had a man he thought he could sell the car to, and he told me who it was, but I do not remember the name." The facts in this case further show that the trade between Hawkins and appellee was made about the 11th day of May, and that the letter from Hughes to appellant, notifying him of the sale, was received by appellant about the 16th of May, when he called up Knight making further inquiry about the car.

[2-6] The relation of agency does not depend upon express appointment, but it must be, and frequently is, implied from the words and conduct of the parties and the circumstances of the particular case. If, from the facts and circumstances, it appears that there was at least an implied intention to create the relation, it will by implication be held to exist. The appellee has not, it may be conceded, proved an express agency, constituting Hawkins appellant's agent; that is as made by himself; but we believe the facts and circumstances raise an implied intention to create the relation, and the court would not have been warranted in instructing a verdict or setting aside the verdict on the ground alone that no agency was shown, or no sufficient evidence of agency shown. Mechem on Agency (2d Ed.) vol. 1, § 708; McAlpin v. Cassidy, 17 Tex. 449; Railway

Co. v. Jones, 82 Tex. 156, 17 S. W. 534; Bradstreet v. Gill, 72 Tex. 115, 9 S. W. 753, 2 L. R. A. 405, 13 Am. St. Rep. 768. Again, we think the fact will warrant the inference that the wife of appellant was in charge and management of his business in the absence of appellant. True, he seeks by his testimony to limit her authority to employing hands to unload cars, etc.; but all the parties agree that she controlled the office and business in the absence of her husband. He was absent when Hawkins was employed by the wife, if Abbott's statement is correct, and while she was in the management of the business. A general agent for the management of the business has authority coextensive in scope with the business intrusted to him to do what is usual and customary to do in the business. Due consideration should be given to the character of the business, the manner in which it is usual to carry it on, and the manner in which it has been previously carried on. Collins v. Cooper, 65 Tex. 460; Wright v. Blackwood, 57 Tex. 644. If the acts done are reasonably necessary to keep the same a going concern, etc. Sun Printing & Pub. Ass'n v. Moore, 183 U. S. 642, 22 Sup. Ct. 240, 46 L. Ed. 366. The nature of appellant's business required the employment of salesmen to go out over the country in search of purchasers and to sell and demonstrate the cars. Such an agency, in order to succeed as a going concern, required such employment. If the facts and circumstances will warrant the inference that there was an implied intention to authorize Hawkins to make the sale of the car by the appellant, or if in the absence of appellant his wife was in management of the business and she then employed Hawkins to sell the car and such act was usual and customary in the conduct of such business or reasonably necessary to carry it on, then Hawkins would be such an agent. If Hawkins was such agent, by implication or by employment, of the wife, and if the sale to appellee was otherwise unobjectionable, the title passed to him, whether he knew of such agency or not. 2 Corpus Juris, § 215, on page 576; Kempner v. Dillard, 100 Tex. 505, 101 S. W. 437, 123 Am. St. Rep. 822; Hamm v. Drew, 83 Tex. 77, 18 S. W. 434; Hackett v. Van Frank, 105 Mo. App. 384, 79 S. W. 1013; Simpkins on Contract and Sale (3d Ed.) p. 1049.

[7-9] Where the act, by which it is sought to bind the principal, was within the authority actually conferred by the principal, whether expressly or impliedly, it is not necessary for a third party to show that he had knowledge of that authority and acted on the faith of it; for, if the facts and circumstances justified the implication of an agency, then the act of the agent is the act of the principal. This should not be confused with the principles which govern an unauthorized act of the agent, for then, if we understand correctly, such act must be such that the third party can invoke estoppel. We do not think agency by estoppel is in this case. Estoppel can only be relied on when the third party knew and relied upon the words or conduct of the principal. It is essential, in order to estop a man to deny the authority of another to act for him, that his representations of authority, whether by word or by conduct, should have been believed and relied on in good faith by the person asserting the estoppel. Mechem on Agency, vol. 1, 722 et seq.; 2 Corpus Juris, § 73, Agency, p. 465; Simpkins, Contract and Sales (3d Ed.) p. 1012 et seq. The facts in this case negative any reliance by appellee upon the words or acts of appellant. He did not know him; never saw him; knew nothing of his business. The mere possession of the car by Hawkins was not sufficient to invoke estoppel. Assuming the testimony is sufficient to support a finding that there was an implied authority in Hawkins to sell the car or to support the finding that the wife, as manager, in the absence of her husband, had authority to employ salesmen, and that she did so employ Hawkins, the question yet remains: Had he authority to sell for anything but cash? In other words, could he barter the car? As a general rule, a power to sell does not include the power to barter. Stember v. Keene, 152 S. W. 663; Griffith v. Morrison, 58 Tex. 46; Fitzhugh v. Franco, etc., 81 Tex. 306, 16 S. W. 1078; Equitable Life, etc., v. Cole, 13 Tex. Civ. App. 486, 35 S. W. 720; Low v. Moore, 31 Tex. Civ. App. 460, 72 S. W. 421. There is no implied authority to exchange or barter property in the contract of agency to sell. Mechem on Agency (2d Ed.) vol. 1, § 895; Kearns v. Nickse, 80 Conn. 23, 66 Atl. 779, 10 L. R. A. (N. S.) 1118, 10 Ann. Cas. 420.

[10] In determining the question of apparent authority, the character of the service, together with the usual practice of agents in such employment, may be looked to, and the agent is held to have implied authority to do all those acts naturally and ordinarily done in such cases, which are reasonably necessary and proper to be done. Mechem on Agency, vol. 1, § 715. The appellee in this case pleaded authority to sell, such as was within the ordinary and customary authority. As above suggested, the law will not imply authority to barter. Clearly the evidence does not raise such authority in the implied agency in this case. On the other hand, it is shown that no exchange was authorized by Holmes to be made by his agents without being submitted to him for approval. The evidence of Abbott is not sufficient to establish a custom or usage. He only purported to state in so far as he knew, it was the custom, etc. He did not say he knew the custom.

[11-13] A usage or custom to affect the agent's power must be shown by clear and satisfactory evidence and must have existed for a length of time so as to become widely and generally known, such as will warrant the presumption that the principal had it in

view at the time of appointing the agent. Mechem on Agency, vol. 1, § 716; Wootters v. Kaufman, 67 Tex. 488, 3 S. W. 465. In this case there was no allegation that the exchange of property by the agent was the usage or custom known or practiced by agents generally. This must be alleged. We do not think the facts in this case, or the law, authorized the appellee to assume that Hawkins had authority to exchange the car for an old one. In this exchange he acted at his peril, and he was bound to take notice of the assumed agent's authority. Baker v. Kellett, etc., 84 S. W. 661; Sackville v. Storey, 149 S. W. 239. On this ground we think the court should have granted a new trial.

[14] We are not inclined to believe that the evidence in this case conclusively shows that appellant revoked the authority of Hawkins prior to the sale of the car. After he learned Hawkins was at Childress with the car, and after he was informed of the proposed purchaser, he instructed that if it was sold to send the draft to him. For a week he did nothing about the car, and not then until he received a letter from Hughes. The mere fact that he directed the car to be placed in the garage did not necessarily evidence the fact that he revoked the power to sell the car. Appellee, as is shown by the testimony, was evidently the proposed purchaser. Knight and Hawkins had visited him previously thereto with the car, and it may well be inferred this was the purchase to whom Knight referred when he informed appellant he was making a mistake. At any rate, when so admonished by Knight, he directed the sale of the car and if made to send him the draft. The evidence is not conclusive in our judgment that appellant revoked the authority of Hawkins to sell the car, if any such was granted him, before the sale to appellee.

It will not be necessary to discuss the other assignments. However, we think the charge of the court is subject to some of the criticisms made by appellant, as that it assumed the wife was the agent of appellant; and with reference to that part which instructed the jury if they found the car was sold for the consideration he did sell it for, or without any limitation as to what the consideration should be, etc. The law fixes the limitation for the consideration of the car as cash, not barter nor trade. We think the court should not have charged on estoppel, and that the fifth paragraph of his charge was therefore error. We believe that he should have excluded the testimony of Abbott, complained of in the twenty-seventh assignment of error, for the reasons heretofore suggested by us. The other exceptions to the testimony of the declarations made by Hawkins, with reference to his agency, we think were properly admitted under the facts of this case.

For the reasons above suggested, the case will be reversed and remanded.