## TRANSCONTINENTAL OIL CO. v. WOFFORD.  (No. 11946.)

Court of Civil Appeals of Texas. Fort Worth. March 24, 1928.

Rehearing Denied April 21, 1928.

**1. Corporations ⬅383—Corporation must act through its duly authorized officers or agents or by its directors.**

A corporation must act only through its officers and employees, duly authorized, either as a matter of law or by the directors thereof.

**2. Corporations ⬅410—General sales manager of oil company held to have authority to bind company on contract for sale of gasoline.**

A general sales manager of an oil company has authority, both actual and apparent, to bind his company on a contract of sale for gasoline where it is usual and customary that such official have such authority, and such authority is necessary to carry on business intrusted to his care.

**3. Corporations ⬅410—Contract for sale of gasoline, signed and approved by officers of oil company after change was made in provision as to discounts by buyer, held binding on company.**

Where change in provision as to discounts in contract for sale of gasoline was made by buyer's attorney, and contract as changed was signed and approved by company's division manager and countersigned by its general sales manager, *held*, that contract was binding on oil company.

**4. Fraud ⬅64(1)—Fraud is question for jury or court trying case in absence of jury.**

Fraud in fact is peculiarly within the province of jury or the court trying the case in the absence of a jury.

**5. Sales ⬅52(7)—Evidence held not to show fraud on part of buyer in making change in contract for sale of gasoline, approved and signed as changed by three officers and employees of oil company.**

Evidence *held* not to show fraud on part of buyer in making change in discount provisions of contract for sale of gasoline, which contract as changed was signed and approved by three officers and employees of oil company and reflected agreements and terms which buyer alleged company's divisional manager told him were contained in written form.

Appeal from District Court, Tarrant County; Bruce Young, Judge.

Suit by the Transcontinental Oil Company against Virgil B. Wofford. From a judgment in its favor for an amount considered insufficient, plaintiff appeals. Affirmed.

John J. Hiner and M. L. Swartzberg, both of Fort Worth, for appellant.

Thompson & Barwise, R. A. Stuart, and F. B. Walker, all of Fort Worth, for appellee.

BUCK, J. This suit was filed September 16, 1926, by the Transcontinental Oil Company against Virgil B. Wofford, upon an itemized account showing a balance alleged to be due by defendant to plaintiff for gasoline furnished by plaintiff to defendant, who operated a filling station in the city of Fort Worth. The balance was alleged to be $2,749.37. Defendant answered by a general demurrer, a general denial, a plea of payment, and further specially pleaded that the plaintiff agreed with defendant that if the gasoline purchased exceeded 10,000 gallons monthly, a discount of 2 cents a gallon was to be allowed on the total amount purchased; if the amount purchased under the contract exceeded 120,000 gallons, the defendant was to be allowed 4 cents a gallon discount on the prevailing "tank wagon market price," and that, by a verbal agreement, defendant was to be allowed an additional 1 cent per gallon on 62,660 gallons purchased after the last agreement was made; that defendant had purchased under the contracts with plaintiff a total of 135,631 gallons of gas, and that, if the discounts agreed upon had been allowed, he would owe plaintiff nothing.

The cause was tried before the court, without the intervention of a jury, and the trial court rendered judgment for plaintiff for $286.75, with interest at 6 per cent from the 1st day of January, 1927. From this judgment the plaintiff has appealed.

The trial court, in connection with his judgment, made the following findings, to wit:

"I find that plaintiff sold and delivered to defendant, under the written contract introduced in evidence, which became effective November 24, 1925, 120,000 gallons of gasoline, and that the defendant is entitled to a discount of 4 cents per gallon thereon.

"I find that the defendant is entitled to a discount of 1 cent per gallon, by verbal contract between the parties, on 62,660 gallons of gasoline, which was furnished after March 1, 1926, amounting to $626.60, and I further find that this discount would not have been allowed by plaintiff except upon the belief that said written contract did not provide for an allowance of 4 cents per gallon discount upon the amount of gasoline to be furnished thereunder.

"I find the defendant is entitled to a discount of 2 cents per gallon on 6,760 gallons, which discount amounts to $135.20; this number of gallons being arrived at by deducting 10,695 plus 120,000 gallons from 137,455 gallons, which was the total amount furnished.

"I find that the total discount to which the defendant is entitled amounts to $5,561.80.

"I find that the defendant paid to plaintiff, and is therefore entitled to a cash credit, after November 24, 1925, the sum of $12,506.95,

which, added to the discounts to which he is entitled, makes a total credit of $18,068.75.

"I find that the value of the gasoline sold and delivered by plaintiff to defendant after the 24th day of November, 1925, amounts to $18,355.50.

"I find that the difference between the amounts due plaintiff by defendant for gasoline furnished after November 24, 1925, less the credits to which defendant is entitled, including cash payments and discounts, leaves a balance of $286.75, and that plaintiff is entitled to a·judgment against the defendant for this amount, together with interest thereon from the 1st day of January, 1927, to the 14th day of July, 1927, at 6 per cent. per annum, which amounts to $9.40, making the total amount of $296.15 due by defendant to plaintiff as of the date of this judgment."

## Opinion.

The appellant sold the gasoline to appellee through J. C. McCoy, sales manager for Texas. The agreement first made was as follows:

"This agreement, made at Fort Worth this 19th day of November, 1925, by and between the Transcontinental Oil Company, hereinafter styled seller, and Wofford Service Station, of Fort Worth, Tex., hereinafter styled buyer, witnesseth:

"That the seller agrees to sell and deliver, by and through its tank wagons or trucks, and the buyer agrees to purchase and receive at his place of business at 938 No. Main street, 10,000 gallons of gasoline from November 19, 1925, to November 19, 1926, inclusive, and the buyer agrees to pay for same at the prevailing tank wagon market of the seller at Fort Worth, Tex., on date of delivery.

"In consideration of this agreement in case the total deliveries to the buyer shall amount to the quantities as shown below during any one calendar month, said buyer shall be entitled to discounts in accordance with the following schedule, to be paid or credited not later than the 15th of the month following:

Discounts.

| Over | 750 gallons per calendar month | | | | ½¢ per gallon | | |
|---|---|---|---|---|---|---|---|
| " | 2,000 | " | " | " | " | ¾¢ | " | " |
| " | 3,000 | " | " | " | " | 1¢ | " | " |
| " | 6,000 | " | " | " | " | 1½¢ | " | " |
| " | 10,000 | " | " | " | " | 2¢ | " | " |

"At the end of the period of this agreement the whole amount purchased during the life of this agreement will be computed and an additional discount paid thereon in case the entire purchase amount to the quantities shown below and at the rates of discount shown, plus any amounts that may have been paid monthly in accordance with the monthly schedule shown above:

Discounts.

| Over | 9,000 gallons per year | | | | ½¢ per gallon | | |
|---|---|---|---|---|---|---|---|
| " | 24,000 | " | " | " | " | ¾¢ | " | " |
| " | 36,000 | " | " | " | " | 1¢ | " | " |
| " | 72,000 | " | " | " | " | 1½¢ | " | " |
| " | 120,000 | " | " | " | " | 2¢ | " | " |

"In computing the quantity of gasoline under this contract, there shall be included all special grades of motor gasoline purchased by buyer on orders accepted by seller.

"Seller is not obligated under this contract to sell and deliver in excess of 120,000 gallons per year.

"Deliveries subject to delays resulting from fires, differences with workmen, or from any other cause or causes beyond its control.

"This agreement shall be executed in triplicate by the parties thereto and shall not be binding upon the seller until approved by its division manager at Fort Worth, Tex., and countersigned by its general manager of sales, and no sale or delivery prior to such approval shall bind seller to the terms and provisions hereof.

"In witness whereof, the parties hereto have hereunto set their signature. Transcontinental Oil Company, by J. C. McCoy, Manager. Inspected by Paul I. Johnston. Approved and countersigned: Transcontinental Oil Company, by J. J. Scott, General Manager of Sales. Date ———. ————, Salesman or Agent. Buyer, Wofford Filling Station, by Virgil B. Wofford."

Defendant Wofford testified that he purchased 10,000 gallons or more of gasoline from the appellant, through J. C. McCoy, and that:

'Some time during the delivery of the 10,000 gallons of gasoline, Mr. McCoy begun to discuss with me entering into a written contract. The written contract was discussed before we closed the oral agreement for the 10,000 gallons—before they had finished the delivery of the 10,000 gallons. We had talked about a written agreement for a year before we settled upon that oral agreement. I had not seen a copy of the written contract until he brought one over there.

"I don't remember the date that I closed the oral contract with Mr. McCoy. We closed the oral agreement for the 10,000 gallons just before they began to deliver the gasoline under that contract, which was along about the 15th or 16th—that is when the first delivery shows —of November.

"We had closed the verbal agreement, and the gasoline was in course of delivery when Mr. McCoy came along with the written contract. I don't remember how many times Mr. McCoy talked to me about this written contract, but he talked to me several times about it over the phone; he was very anxious to get that business. He finally brought the written contract, we discussed it; 'we sat down and discussed it and he explained it to me and proposed that I sign it; he said, 'Wofford, here is a contract that gives you two cents a gallon, monthly, if you buy 10,000 gallons a month, which you will do, and that will be paid monthly in gasoline, as it has been in this verbal agreement—that is, when the credits accumulate, we will charge the tickets to your account and then not collect the tickets and just mark them, "Paid," ' which they did, the same way as in the verbal agreement for the first 10,000 gallons; that is the way it was handled.

"Mr. McCoy and I discussed that contract and, among other things, I told Mr. McCoy, I says, 'No, sir, I am not going to sign this contract; I am not going to sign any more contracts until I have them examined by an attorney.' I also told him about these other contracts that I had signed, and where the salesman had explained them to me and when it came to a showdown, why, the contract didn't say what the salesman said it said and that I had got the worst of it; that is not the exact language that I told him, but it was words to that effect, and I told him

that I was not going to sign this contract with him until I had an attorney inspect it and approve of it and see if it said what he told me that it· said, and I also told him at that time, I says, 'Mr. McCoy, if this contract doesn't say what you tell me it says, this is one contract that is going to say what we have agreed on before I sign it, and if it don't say what you have told me that it does say and explained to me, why, I am going to have my attorney make it say that before I ever sign it.' Now, then, I told Mr. McCoy words to that effect and I believe those are almost the exact words, and the reasons that I explained to him.

"Mr. McCoy told me there at that time what this contract meant, and that is when I made the remark that I have repeated here. He told me that instead of getting 2½ cents as I was getting on the 10,000 gallon contract, that I would only get 2 cents per month as it accumulated, and then at the end of the year the whole thing would be figured up and I would get an additional 2 cents. That is what he told me at that time."

Witness then stated that he turned the contract form over to his lawyer, R. A. Stuart, and told the lawyer what Mr. McCoy and his agreement was, and that he wanted this written contract to express that contract. The contract was returned in a few days by his lawyer, and McCoy came by and got the contract a few days later, at a time when he and his help were all very busy waiting on his trade; that he did not get to talk to him about any changes that his lawyer had made in the form of the contract, in order for the contract to speak the agreement made theretofore by the witness and McCoy. It seems that his lawyer had changed only one word, changing the word "less" to "plus," so that the paragraph read as follows, we italicizing the word so changed:

"At the end of the period of this agreement the whole amount purchased during the life of this agreement will be computed and an additional discount paid thereon in case the entire purchase amount to the quantities shown below and at the rates of discount shown, *plus* any amounts that may have been paid monthly in accordance with the monthly schedule shown above:

### Discounts.

| Over | 9,000 gallons per year ½¢ per gallon |  |  |  |  |  |
|---|---|---|---|---|---|---|
| " | 24,000 | " | " | " | ¾¢ | " | " |
| " | 36,000 | " | " | " | 1¢ | " | " |
| " | 72,000 | " | " | " | 1½¢ | " | " |
| " | 120,000 | " | " | " | 2¢ | " | " |

Witness testified that the change of the word "less" to "plus" was necessary in order to make the written contract express the oral contract theretofore made by Wofford and McCoy. The written contract was made in triplicate. Witness testified further that a further change was made in writing by F. F. Earls, his brother-in-law and bookkeeper, giving the correct street address of the location of his filling station. But no complaint is made as to this change. The evidence shows that upon the return by Wofford of the triplicate forms, as changed, to McCoy, the latter

signed them, as indicated in the copy of the contract hereinbefore inserted, and sent them to Tulsa, Okl., the headquarters, where they were signed by H. J. Scott, general sales manager of the company, and inspected and signed by Paul I. Johnston, assistant general sales manager. Subsequently, Wofford's copy was returned to him.

Appellant urges: That the change in the contract escaped the notice of its three officers and employees, to wit, McCoy, Johnston, and Scott, and that they signed the contract ignorant of the change. That the substitution of the word "plus" for "less" was made by appellee or his attorney in the same kind of type, which they allege to have been an unusual character of type, and that such officers were misled by the act of appellee and his attorney, which is alleged to be a fraudulent act, into signing the contract. That no one except the directors of the corporation company had the authority to change the form of the contract, which had been prepared by its counsel and approved by its directors, and that, therefore, it is not bound by the change made without the knowledge or consent of its directors, and in ignorance of which change the contract was signed and executed by the three officers and employees signing the same.

Appellee testified that the reason he did not call McCoy's attention to the change made was because, when McCoy called for the triplicate copies of the contract, he was very busy waiting on the trade, as before stated.

[1-3] A corporation must act only through its officers and employees, duly authorized, either as a matter of law or by the directors thereof. The form of the contract under consideration was signed by the Transcontinental Oil Company, "by J. C. McCoy, Manager," and space left for the signature of Paul I. Johnston, preceded by the words "Inspected by." Then the words, "Approved and countersigned: Transcontinental Oil Company, by ————, General Manager of Sales," followed, and H. J. Scott signed and approved the contract for the company. Therefore the officers and employees, authorized by the form submitted to execute the contract, were the officers and employees who in fact did execute it. If the testimony of appellee be assumed to be correct, which must be done in support of the judgment, then the contract as written, with the change made, reflects the contract theretofore made between McCoy and Wofford. The case having been tried before the court, and no request having been made for a finding upon the issue as to whether or not any fraud was perpetrated or intended by Wofford in making the change, we must assume that the trial court found that no fraud was perpetrated or intended. A general sales manager has authority, both actual and apparent, to bind his company on a contract of sale for gasoline where it is usual and customary that such official have

such authority, and where such authority is necessary to carry on that part of the business entrusted to the case of such official. The contract itself has this provision:

"This agreement shall be executed in triplicate by the parties thereto and shall not be binding upon the seller until approved by its division manager at Fort Worth, Tex., and countersigned by its general manager of sales, and no sale or delivery prior to such approval shall bind seller to the terms and provisions hereof."

The contract made, as shown by the written evidence thereof, was approved by the company's division manager at Fort Worth and countersigned by its general manager of sales. In Hinton v. D'Yarmett, 212 S. W. 518, opinion by Chief Justice Conner of this court, it is said:

"It is alleged that O. M. Topley was the appellee oil company's 'general manager.' The very terms import general authority to perform all reasonable things in conducting the usual and customary business of his principal. In Railway Co. v. Reisner, 18 Kan. 458, it was held that the terms 'general manager' and 'general agent' are synonymous; that the general agent of the company was virtually the corporation itself, and therefore had authority to bind the company for the expense of board, etc., for an injured brakeman. While a general agent may not ordinarily, without special authority, surrender important rights of his principal, yet there are many cases, says Mechem in his work on Agency, p. 991, where a 'general manager' or 'general agent' (and he treats the terms synonymously) 'may meet emergencies, and provide for unexpected exigencies, and these may involve waivers of time, or alterations of terms, as waivers of condition, or surrender of technical rights, as mere natural and ordinary incidents.' Numerous illustrations of the test are given in the notes, and we think the allegations of appellant's petition bring this case within the principle stated, especially in view of the fact that, viewing the petition as a whole, the new contract is so manifestly for the benefit of the oil company and so apparently within the scope of the business and practice of developing oil companies as generally understood."

See Booker-Jones Oil Co. v. National Refining Co., 132 S. W. 815, by the Austin Court of Civil Appeals; Swartz v. Minnesota Mut. Life Ins. Co., 293 S. W. 256, by the Galveston Court of Civil Appeals; Holmes v. Tyner (Tex. Civ. App.) 179 S. W. 892; Bergere v. Parker, 170 S. W. 808, by the El Paso Court of Civil Appeals; Sealy Oil Mill Co. v. Bishop Mfg. Co., 235 S. W. 850, by the Commission of Appeals, approved by the Supreme Court.

We conclude that appellant is bound by the act of its three officers and employees in executing the contract in question. Therefore appellant's first assignment is overruled.

[4, 5] The second proposition asserts that the contract in question in this case is void because of fraud on the part of appellee. We do not believe this assignment should be sustained, because the facts show, by the testimony of appellee, and supported to some extent by the testimony of his bookkeeper, Earls, that when McCoy first approached Wofford about entering into a written contract, and after they had talked over what purported to be contained in the form of contract submitted, Wofford told him that he was not going to sign the contract until it had been examined by his lawyer, and McCoy gave him the contract for his lawyer to examine it. The contract, as executed, reflects the agreements and terms which Wofford testified McCoy told him was contained in the written form. Wofford knew that McCoy could not make the contract himself, but that it was subject to the approval of the general sales manager. When the forms of the contract were returned to McCoy, the change had been made, according to Wofford's testimony, to make the written contract comply with the verbal agreement between him and McCoy. Then McCoy sent the contract to Tulsa, where it was inspected by Paul I. Johnston and approved by H. J. Scott, for the company. The Transcontinental Company expressly reserved the right in the contract, which Wofford executed, to either approve or reject the contract. There was no contract until approved by the Tulsa officials of the appellant company. As before stated, we must assume, in the condition of the record, that the trial court found against the plaintiff's plea of fraud. Fraud, in fact, is peculiarly within the province of the jury, or the court trying the case in the absence of a jury. Drinkard v. Ingram, 21 Tex. 650, 73 Am. Dec. 250; Stringfellow v. Brazelton (Tex. Civ. App.) 142 S. W. 937, writ of error denied; Hancock v. Blumentritt (Tex. Civ. App.) 269 S. W. 177. It will be remembered that in the allegation of plaintiff's petition, in which it charges fraud on the part of defendant, it is not alleged that any statement was made by the defendant or his agents which would have reasonably led the appellant or its officers to rely upon the assumption that the contract as returned to McCoy had not been changed. As stated in McNinch v. Northwest Thresher Co., 23 Okl. 393, 100 P. 526 (138 Am. St. Rep. 803):

"There is no allegation in the answer stating that the defendant signed the written instrument in reliance upon or assurance from the plaintiff that it contained the true contract. On the contrary, it appears that he signed the writing without any assurance from, or reliance upon, anybody as to what it contained."

Wofford made no actionable representation to McCoy, upon the return of the contract. His offer spoke for itself and he was making such offer to the Tulsa agents and not to McCoy. He made it in writing, and it is not disputed that the writing in all respects was legible and the Tulsa agents did not have to accept the offer unless they wished to do so.

The Amarillo Court of Civil Appeals in Alexander v. Anderson, 207 S. W. 205, said:

"When a party undertakes to ascertain' for himself the contents of an instrument, he will be charged with its stipulations, and the fact that fraudulent representations were made will not justify him in relying upon them; but he will be charged with the terms of the contract."

In Newman v. Lyman, 165 S. W. 136, the Amarillo Court of Civil Appeals said:

"If a party undertakes to discover the truth, then he is bound by everything which a proper investigation would disclose, and the fact that fraudulent representations have been made would not justify him in acting upon them."

But we do not believe that in the present case any fraudulent representations were made.

All assignments of error are overruled, and the judgment is affirmed.